INDIANAPOLIS INDIANA AAMCO DEALERS ADVERTISING POOL, Appellant/Plaintiff,

v.

Joseph L. ANDERSON and Mark E. Haines, Appellees/Judgment Defendants,

Matt Anderson and Colonial Renting and Leasing, Inc., Appellees/Garnishee–Defendants.

No. 48A02–0005–CV–282.

Court of Appeals of Indiana.

April 9, 2001.

J.F. Beatty, Nancy G. Endsley, Landman & Beatty, Indianapolis, IN, Attorneys for Appellant.

Max Howard, Howard, DeLey & Hooley, Anderson, IN; Donald H. Dunnuck, Dunnuck & Associates, Muncie, IN, Attorneys for Appellees Joseph L. Anderson, Matt Anderson and Colonial Renting And Leasing, Inc.

## OPINION

SULLIVAN, Judge.

Appellant, Indianapolis Indiana Aamco Dealers Advertising Pool (Ad Pool), challenges the trial court's judgment in favor of appellees Joseph Anderson (Joseph), Matt Anderson (Matt), and Colonial Renting and Leasing, Inc. (Colonial). Ad Pool presents four issues upon appeal, which we restate as: (1) whether the trial court erred in concluding Joseph received a reasonably equivalent value in return for the release of a loan owed to him by Colonial; (2) whether the trial court erred by failing to make findings regarding Joseph's solvency at the time the loan was released; (3) whether the trial court's determination that the loan was reclassified as a paid-in capital contribution was contrary to law; and (4) whether the trial court erred by failing to make findings with respect to Joseph's intent regarding the release of the loan.

We affirm.

The record reveals that Joseph Anderson formed Colonial in 1976 as a subchapter S corporation. Joseph was the lone shareholder of Colonial stock. In 1988, Joseph used Colonial as the corpo-

rate entity for operating a Dairy Queen franchise. Colonial consistently lost money, prompting Joseph to invest $90,000 in Colonial to keep it in operation. Although Joseph did not consider this money to be a loan, Colonial's income tax returns from 1993 through 1996 listed the $90,000 as a loan from a shareholder.

In 1987, Ad Pool filed a lawsuit against Joseph for breach of an advertising agreement. *See Anderson v. Indianapolis Indiana AAMCO Dealers Advertising Pool,* 678 N.E.2d 832 (Ind.Ct.App.1997), *trans. denied.* Eight years later, while the suit was pending in March 1995, Joseph agreed to transfer his interest in Colonial to his son, Matt. On June 28 and 29, 1995, trial was held in the suit between Joseph and Ad Pool. On July 1, 1995, Joseph formally transferred all of his shares in Colonial to Matt. Over four months later, on November 14, 1995, Ad Pool obtained a judgment against Joseph in the amount of $309,617.92. The judgment was upheld by this court in *Anderson,* 678 N.E.2d at 838.

In October of 1997, Ad Pool, in an attempt to collect on the judgment, petitioned the trial court to set aside the transfer of stock from Joseph to Matt and appoint a receiver for Colonial. Ad Pool later amended the petition to ask the trial court to set aside Joseph's release of the $90,000 loan. The trial court entered findings of fact and conclusions of law as requested by Ad Pool pursuant to Ind.Trial Rule 52(A). The trial court's judgment was in favor of Joseph, Matt, and Colonial. Ad Pool now appeals.

# I

## Standard of Review

At Ad Pool's request, the trial court issued special findings of fact and conclusions of law pursuant to T.R. 52. These special findings should contain all of the facts necessary for a judgment for the party in whose favor conclusions of law are found. *Moore v. Moore,* 695 N.E.2d 1004, 1008 (Ind.Ct.App.1998). The purpose of making special findings is to provide a theory of the judgment. *Id.* When a trial court enters special findings of fact, our standard of review is two-tiered: (1) we determine whether the evidence supports the findings, and (2) we determine whether the findings support the judgment. *Lee's Ready Mix and Trucking, Inc. v. Creech,* 660 N.E.2d 1033, 1037 (Ind.Ct.App.1996).

We will not disturb the trial court's findings unless they are clearly erroneous. *In re Paternity of J.A.C.,* 734 N.E.2d 1057, 1059 (Ind.Ct.App.2000). Findings of fact are clearly erroneous when the record lacks any reasonable inferences from the evidence to support them. *In re R.P.D. ex rel. Dick,* 708 N.E.2d 916, 919 (Ind.Ct.App.1999), *trans. denied.* Similarly, the trial court's judgment will be reversed only if it is clearly erroneous. *Creech,* 660 N.E.2d at 1037. As Ad Pool is appealing from a negative judgment, we will reverse only if the evidence is without conflict, and all reasonable inferences to be drawn from the evidence lead to a conclusion other than that reached by the trial court. *Id.* We will not reweigh the evidence nor judge witness credibility. *Id.*

# II

## Adequacy of Findings

Ad Pool first claims that the trial court did not make complete and adequate findings regarding the $90,000 Joseph loaned to Colonial. According to Ad Pool, complete findings of fact on this issue would establish that Joseph's release of the loan was a fraudulent transfer as defined by the Indiana Uniform Fraudulent Transfer Act. Ind.Code §§ 32–2–7–1 to 32–2–7–21

(Burns Code Ed. Repl. 1995). Under the Uniform Fraudulent Transfer Act, a "transfer" is defined as "any mode of disposing of or parting with an asset or an interest in an asset ... [including] payment of money, *release,* lease, and creation of a lien or other encumbrance." I.C. § 32–2–7–10 (emphasis supplied). Two sections of the Uniform Fraudulent Transfer Act define a fraudulent transfer. The first of these sections, I.C. § 32–2–7–14 reads in part as follows:

A transfer made ... by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made ... if the debtor made the transfer ...

* * *

(2) *without receiving a reasonably equivalent value in exchange for the transfer* ... and the debtor:

(A) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or

(B) intended to incur or believed or reasonably should have believed that the debtor would incur debts beyond the debtor's ability to pay as the debts became due.

(emphasis supplied). Indiana Code § 32–2–7–15 reads in part as follows:

A transfer made ... is fraudulent as to a creditor whose claim arose before the transfer was made ... if:

(1) *the debtor made the transfer ... without receiving a reasonably equiv-*

*alent value in exchange for the transfer* ... and:

(2) the debtor:

(A) was insolvent at that time; or

(B) became insolvent as a result of the transfer....

(emphasis supplied).

Thus, to prove a fraudulent transfer under either Section 14(2) or 15, Ad Pool had to show that the $90,000 loan was released by Joseph without receiving a reasonably equivalent value in return.[1] "Value is given for a transfer ... if, in exchange for the transfer ... an antecedent debt is secured or satisfied." I.C. § 32–2–7–13(a).

■ We note that Ad Pool does not challenge the trial court's determination that the transfer of the Colonial stock to Matt, in exchange for Matt assuming the liabilities of Colonial, was not fraudulent.[2] Ad Pool does claim that the trial court's conclusion that the release of the $90,000 loan was not fraudulent is unsupported by the findings. Specifically, Ad Pool claims that the findings do not indicate when the loan was reclassified as a paid-in capital contribution. Ad Pool claims that complete findings of fact would indicate that Joseph did not release Colonial from the $90,000 loan until after Colonial had been transferred to Matt. Thus, according to Ad Pool, the $90,000 loan was released without Joseph receiving a reasonably equivalent value in return and that therefore, the release was fraudulent as to Ad Pool. In essence, Ad Pool is attacking the findings as being clearly erroneous.

---

1. As defined by the Indiana Uniform Fraudulent Transfer Act, a " 'claim' [is] a right to payment, whether or not the right is ... reduced to judgment." I.C. § 32–2–7–3(1). Thus, because Ad Pool's claim arose prior to the transfer at issue, Ad Pool claims the trans-

fer was fraudulent with regard to either Section 14 or 15.

2. Joseph testified that, before Colonial was transferred to Matt, he was personally liable for all of the corporation's liabilities.

The trial court's findings read, in pertinent part, as follows:

16. At the end of 1994, just before Matt purchased [Colonial], the stockholder's equity was a negative $100,000 plus.

17. By reclassifying the $90,000 shareholder loan to paid in capital, the shareholder equity was reduced to a negative $10,000.00 plus.

* * *

19. Matt Anderson purchased the colonial stock by agreeing to pay all of the outstanding debt of the corporation, which totaled $125,645 (after reclassification of the stockholder loan to paid in capital), and in return received the capital stock of the corporation which had assets of $114,851. The assets were secured by a bank loan.

Record at 538. We must now consider whether the evidence and the reasonable inferences to be drawn therefrom support the trial court's findings.

Robert Schlegel, an economist working for Hoolahan Valuation Advisers, testified that, as of December 31, 1994, the stockholder's equity in Colonial was negative $100,000. Schlegel's valuation report indicated that at the end of 1994, Colonial had $114,851 in total assets and $215,645 in liabilities including the $90,000 shareholder loan. Thus, Colonial was worth negative $100,794. By reclassifying the $90,000 to paid-in capital, Colonial was worth negative $10,794.[3] Robert Peck, a CPA, testified that Colonial had a negative value of approximately $10,000. Joseph testified that, before the transfer of Colonial to Matt, he was personally liable for all of the corporation's debts. There was evidence that, in exchange for the transfer of the Colonial stock, Matt agreed to assume all of Colonial's debts. Schlegel also testified that there was no indication that there was any change in Colonial's financial position from December 31, 1994 to when Colonial was transferred to Matt.

Ad Pool insists that the evidence demonstrated that reclassification of the $90,000 loan occurred after the transfer of the Colonial stock. In support of its position, Ad Pool refers us to Colonial's tax returns for 1995 and 1996, which list a $90,000 shareholder loan on Colonial's balance sheet.[4] Joseph testified that he did not know why the $90,000 was still listed as a loan on Colonial's tax returns after the transfer to Matt and that he eventually told the accountants to "forget it, write it off or do whatever with it." Record at 681. Colonial's 1996 return includes a footnote which states that "ON THE ADVENT OF A 100% CHANGE IN OWNERSHIP, THE CORPORATION WAS RECAPITALIZED BY ... ADDING $90,000 NOTE TO PAID IN CAPITAL." Record at 708. In addition, both Joseph and Matt testified that when Matt assumed ownership of Colonial, both consid-

3. Schlegel's valuation report indicated that the value of Colonial was $6,526. Nevertheless, the trial court found that:

The evaluation of the Colonial stock at $6,500 by Robert C. Schlegel was accomplished by inflating the good will of the corporation to arrive at a positive value less than $10,000 for tax purposes only, and the true value was negligible as testified to by both expert witnesses, Robert C. Schlegel and Richard B. Peck, Jr.

Record at 538. This finding was supported by the evidence. Both Schlegel and Robert Peck, a CPA, testified that, for tax purposes, the goodwill of Colonial was used to inflate Colonial's value to a positive number less than $10,000.

4. The balance sheet on Colonial's 1997 income tax return lists the $90,000 as a shareholder loan at the beginning of the tax year, but includes it as paid-in capital as of the end of the tax year.

ered the $90,000 to be a contribution to the capital of the corporation, not a debt.

Although there was evidence supporting Ad Pool's position that the debt was not reclassified until after the transfer of Colonial to Matt, we must consider only the evidence favorable to the trial court's judgment and all reasonable inferences to be drawn therefrom. *In re R.P.D.*, 708 N.E.2d at 919. Here, the evidence is not without conflict, and all reasonable inferences to be drawn from the evidence do not lead to a conclusion different from that reached by the trial court. *See Creech*, 660 N.E.2d at 1037. Therefore, we cannot say that the trial court's findings are clearly erroneous.

■ We must now determine whether the findings support the trial court's judgment. To be sure, the trial court's findings could have been more specific and thorough. Be that as it may, a trial court's findings should be liberally construed upon appeal to support the judgment. *In re J.A.C.*, 734 N.E.2d at 1059.

■ The trial court's findings indicate that Matt purchased Colonial by agreeing to assume $125,645 in liabilities. This carries with it an inferential finding that the loan was reclassified prior to or contemporaneously with the transfer of the Colonial stock to Matt. Had the trial court believed otherwise, its findings would have necessarily indicated that Matt agreed to purchase Colonial by assuming a debt of $215,645, i.e. Colonial's liabilities inclusive of the $90,000 loan. Thus, by releasing Colonial from the loan, Joseph transferred a corporation which had a negative value of over $10,000. This supports the trial court's conclusion that the transfer of Colonial stock (and therefore the release of the $90,000 loan), was in exchange for a reasonably equivalent value. *See* I.C. § 32–2–7–13(a). Ad Pool attempts to separate the release of the $90,000 loan from the transfer of Colonial stock. However,

the findings indicate that the trial court considered these events to be part of one transaction. The evidence supports the trial court's findings, and the findings support the judgment.

## III

### *Joseph's Solvency*

■ Ad Pool also claims that the trial court erred by failing to make findings of fact with regard to Joseph's solvency. However, Joseph's solvency would be an issue only had the trial court found that Joseph had not received a reasonably equivalent value in exchange for the $90,000 loan release. *See* I.C. § 32–2–7–15(2). Because we have determined that the trial court did not err in finding that Joseph received a reasonably equivalent value in return for the loan release, Joseph's solvency is not relevant. The trial court's findings needed only to contain all of the facts necessary for a judgment in favor of Joseph. *See Moore*, 695 N.E.2d at 1008. The trial court did not err by failing to make findings regarding Joseph's solvency.

## IV

### *Reclassification of the Loan*

■ Next, Ad Pool contends that the trial court erred by reclassifying the $90,000 shareholder loan as a paid-in capital contribution. First, we feel it necessary to note that the trial court did not reclassify the loan. This was done by Colonial's accountant. Regardless, Ad Pool argues that the reclassification was contrary to law. Ad Pool claims that the trial court's judgment allows Joseph, Matt, and Colonial to have the best of both worlds. That is, because Colonial is no longer obligated to repay Joseph, Ad Pool cannot garnish any repayment, and to Co-

lonial's further benefit, it realizes no income tax consequence from the release of the loan.

Whether or not the loan was forgiven or reclassified as a paid-in capital contribution, the trial court determined that Joseph received a reasonably equivalent value in return. In exchange for Joseph releasing Colonial from the loan, Colonial's valuation was increased to a negative value in excess of $10,000. Matt assumed this liability when Colonial was transferred to him. Whether or not Colonial realized gross income as a result is a matter between Colonial and the United States Internal Revenue Service, not this court.[5]

### V

### *Badges of Fraud*

■ Finally, Ad Pool claims that the findings do not support the conclusion that Joseph was free of the intent to fraudulently transfer the $90,000 to Colonial. "A transfer made . . . is fraudulent as to a creditor, whether the creditor's claim arose before or after the transfer was made . . . if the debtor made the transfer . . . [w]ith actual intent to hinder, delay, or defraud any creditor of the debtor. . . ." I.C. § 32–2–7–14(1). Ad Pool claims that there was "overwhelming evidence of an actual intent to hinder the Ad Pool's collection of its debts. . . ." Appellant's Brief at 14.

■ Fraudulent intent may be inferred from the presence of various factors or "badges of fraud" in a transaction. *Diss v. Agri Business Intern., Inc.*, 670 N.E.2d 97, 100 (Ind.Ct.App.1996). These factors include:

the transfer of property by a debtor during the pendency of a suit; a transfer of property that renders the debtor insolvent or greatly reduces his estate; a series of contemporaneous transactions which strip the debtor of all property available for execution; secret or hurried transactions not in the usual mode of doing business; any transaction conducted in a manner differing from customary methods; a transaction whereby the debtor retains benefits over the transferred property; little or no consideration in return for the transfer; a transfer of property between family members.

*Id.* (quoting *Johnson v. Estate of Rayburn*, 587 N.E.2d 182, 186 (Ind.Ct.App.1992)).

Here, the trial court, as the trier of fact, specifically found that "[a]ll of the inferences that may be drawn from any 'badges of fraud' (other than the parentage of Matt Anderson), claim[ed] by Plaintiff are refuted by the facts in evidence." Record at 539. Despite these findings, Ad Pool claims that the trial court made no findings regarding badges of fraud relating to the release of the $90,000 loan. Once again, Ad Pool attempts to bifurcate the release of the loan from the transfer of Colonial to Matt. We have already determined that the trial court's findings support an inference that these two events occurred contemporaneously, and that there was evidence to support this conclusion. When the trial court found that there was no fraudulent intent on the part of Joseph, it obviously referred to both the transfer of the Colonial stock and the release of the $90,000 loan.

---

5.  We note that Schlegel testified that the IRS will occasionally reclassify long-standing shareholder loans as paid-in capital. Also, Peck testified that, from an income tax perspective, it was inconsequential whether the $90,000 was considered as a loan or paid-in capital.

Ad Pool's argument is simply an attack on the sufficiency of the evidence. We do not reweigh evidence or judge witness credibility upon appeal. *Creech,* 660 N.E.2d at 1037. Here, there was evidence that the transfer in question took place during the pendency of the lawsuit against Joseph. The transfer also took place between family members. These factors may have supported an inference of fraudulent intent if viewed by a different trier of fact. *Diss,* 670 N.E.2d at 100. Although Joseph no longer controls Colonial, he did receive compensation for doing bookkeeping for Colonial. However, the evidence indicated that the transfer did not render Joseph insolvent or greatly reduce his estate. In fact, the evidence indicated that Joseph was relieved of approximately $10,000 of debt by releasing the $90,000 loan and transferring Colonial to Joseph. Therefore, Joseph received consideration for the transfer.

The trial court also made extensive findings relating to whether or not the transaction was secret or hurried. Ad Pool admits that the trial court made findings of fact that Matt had been "groomed" since high school to operate the Dairy Queen business. Appellant's Brief at 12. Ad Pool insists that these findings have no bearing upon whether or not Joseph intended the transfer to be fraudulent. To the contrary, they indicated that the transfer was not secret or hurried or done in an unusual mode.

Although Ad Pool claims that the loan release and transfer of Colonial stripped Joseph of property available for execution, there was evidence that Joseph's financial position was improved by transferring Colonial to Matt. Additionally, Peck testified that the loan had no fair market value.

Although the evidence indicated that several badges of fraud may have been present in the transfer in question, the trial court specifically found that there was no fraudulent intent by Joseph when he transferred Colonial to Matt. No single badge of fraud constitutes a showing of fraudulent intent; instead, the facts must be taken together to determine how many badges of fraud exist and if together they amount to a pattern from which an inference of fraudulent intent may be drawn. *Creech,* 660 N.E.2d at 1037. The determination of whether there was fraudulent intent rests with the trier of fact. *Id.* We cannot say that as a matter of law the trial court's determination is erroneous. Ad Pool merely invites us to reweigh the evidence, which we will not do. Although the trial court's findings could have been more specific, they are supported by the evidence, and the findings support the trial court's conclusion that the transfer of Colonial stock to Matt and the release of the $90,000 loan was not fraudulent.

The judgment of the trial court is affirmed.

SHARPNACK, C.J., and MATHIAS, J., concur.