## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 21 2016, 8:42 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEYS FOR APPELLANTS

Kathrine D. Jack
Paul B. Overhauser
Overhauser Law Offices, LLC
Greenfield, Indiana

ATTORNEY FOR APPELLEE
STRATUS FRANCHISING, LLC

John F. McCauley
Bingham Greenebaum Doll LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Nidia Martinez, et al., on Behalf of Herself and Others Similarly Situated<br><br>*Appellants-Plaintiffs,*<br><br>v.<br><br>Stratus Franchising, LLC, et al.,<br><br>*Appellees-Defendants* | June 21, 2016<br><br>Court of Appeals Case No. 49A02-1509-PL-1317<br><br>Appeal from the Marion County Superior Court, Civil Division 2<br><br>The Honorable Timothy W. Oakes, Judge<br><br>Trial Court Cause No. 49D02-1206-PL-23299 |

**Bailey, Judge.**

# Case Summary

Between 2009 and 2012, plaintiffs Nidia Martinez, Maria Manriquez, Elsa de la Cruz, Eni Cruz Rodriguez, Victor Garcia, Laura Andolon, Ronny Funes, Theresa Escobedo, Lorenzo Rodriguez, Faustina Negrete, Yolanda Alvarez, and Jose Leon performed commercial cleaning services as "franchisees" of Shamrock Building Services, Inc. d/b/a Stratus Building Solutions of Indianapolis ("Shamrock"), an Indiana commercial cleaning company operating as a regional "master franchise" of Missouri-based Stratus Franchising, L.L.C. ("Stratus"). In June 2012, the plaintiffs brought this class action on behalf of themselves and others similarly situated ("the Class"), alleging, among various claims against several parties, that Stratus aided and abetted franchise fraud and committed civil deception. Following a three-day bench trial, the trial court entered judgment in favor of Stratus. The Class now appeals. We affirm.

# Issue

The Class presents four issues for our review, which we consolidate and restate as: whether the trial court's findings of fact and conclusion that Stratus did not aid and abet franchise fraud were clearly erroneous.

# Facts and Procedural History

Stratus is a Missouri company that delivers commercial cleaning and janitorial services through a multi-tiered franchise model. Stratus sells "master

franchises" to individuals and businesses ("master franchisors") that receive exclusive rights to operate a Stratus franchise in a specific territory. Master franchisors then contract directly with customers in their region in need of commercial cleaning services. To deliver these services, master franchisors sell "unit franchises" to individuals ("franchisees") who clean the customers' sites.

[4] Under the Stratus system, the master franchisor offers unit franchises for sale at sixteen different price points. Depending on the initial franchise fee paid, the master franchisor agrees to provide the franchisee with customer accounts generating a certain level of revenue. The following table, a partial reproduction of a chart used during franchise sales presentations ("Exhibit 104" or "the franchise chart"), illustrates three "basic" franchise plans offered:

| Plan # | Total Income | Down Payment | Financed @ 15 Percent | Total Investment | Full Cash Payment |
|---|---|---|---|---|---|
| SBS-6 | **$6,000/Year** ($500/Month) | $1,000 | $2,000 ($69.33/Month) | $3,000 | $2,700 |
| SBS-9 | **$9,000/Year** ($750/Month) | $3,200 | $2,000 ($69.33/Month) | $5,200 | $4,160 |
| SBS-12 | **$12,000/Year** ($1,000/Month) | $4,000 | $2,000 ($69.33/Month) | $6,000 | $4,800 |

(Exhibit 104.) Thus, under the "SBS-6" plan, the master franchisor agrees to provide the franchisee with customer accounts generating $6,000 per year (or $500 per month) in "total income" for a "total investment" of $3000 (or $2700 if paid in cash). As the table shows, a franchisee could finance the purchase by making a partial cash down payment ($1000) and financing the balance ($2000) at a 15% interest rate (over 36 months). Stratus advertises its system as providing franchisees with the opportunity to "own and operate your own

successful business" with "guaranteed customers" and "guaranteed financing" for "as low as $1000 down." (Exhibit 65, p. 7.)

[5] In 2008, Kevin Spellacy ("Spellacy"), owner and chief executive officer of Shamrock, purchased a master franchise from Stratus for the Indiana region. Stratus provided Shamrock with a template franchise registration document[1] and $500 to pay the Indiana franchise registration fee. Spellacy filled out the registration at Stratus's corporate offices in Missouri, then submitted the registration to the Indiana Secretary of State. The registration included a Franchise Disclosure Document ("FDD"), an eighty-one page document prepared by Stratus disclosing the details of the Stratus system. The FDD contained a template unit franchise sales contract, the Unit Franchise Agreement ("UFA"), as Exhibit A.

[6] Shamrock soon began acquiring customer accounts in central Indiana and recruiting franchisees to clean the sites.[2] To help sell unit franchises, Stratus provided Shamrock with sales and marketing tools. A Stratus franchise sales manual included sales tips, advertisement templates touting "guaranteed customers" (Exhibit 65, p. 7-9), and a complete PowerPoint sales presentation

---

[1] Generally, a person may not offer or sell a franchise in Indiana unless the franchise is registered with the Indiana securities commissioner. *See* I.C. §§ 23-2-2.5-9 & -10.5.

[2] Spellacy described the start-up as: "[Y]ou kind of work both ends against the middle. You're trying to find franchises at the same time you're finding accounts, and you're always doing both with equal vigor." (Tr. 256.)

with accompanying script. Stratus also provided Shamrock with franchisee referrals via the corporate website.

[7] In Indiana, Shamrock targeted its advertisements to Hispanic residents by taking out ads in *La Voz de Indiana*, a bilingual (Spanish-English) newspaper, and on Radio Latina, an Indianapolis-based Spanish-language radio station.[3] These advertisements also promoted the Stratus system as providing "clientes garantizados" or "guaranteed customers." (Exhibit 56; Tr. 125.) Shamrock hired bilingual employees to give sales presentations in Spanish at Shamrock's corporate offices. Eight-five percent of Shamrock's franchisees spoke primarily Spanish or had limited proficiency with English.

[8] During the sales presentations, Shamrock employees used the Stratus sales presentation and the franchise chart. When discussing the "Total Income" column, the manual instructed users to describe the franchise plans as providing "guaranteed gross revenue." (Exhibit 65, p. 53.) The manual also directed master franchisors to inform prospective franchises about additional fees that would be assessed on monthly gross revenue. These fees included mandatory 5% royalty and 10% administration fees, and an optional (but customary) 5% insurance fee.[4] Franchisees also were required to purchase an initial equipment

---

[3] In the "Ethnic Groups" chapter of the sales manual, Stratus urged master franchisors to target franchise sales to "the ethnic communities" using "'guerilla' marketing efforts." (Exhibit 65, p. 11-12.)

[4] Although franchisees had the option of purchasing their own insurance, "of the 103 owner-operators that [Shamrock] had . . . there [were] no more than two, maybe three of them, that had their own insurance." (Tr. 328.)

and supply package from the master franchisor.  If a franchisee wanted to increase his gross monthly revenue beyond his initial plan level, the manual explained that Shamrock would sell him additional customer accounts for an "account acquisition fee" assessed on the additional gross monthly billing.[5] (Exhibit 65, p. 49.)  At Stratus's instruction, Shamrock provided prospective franchisees with an FDD and UFA at the close of the sales presentation.

Shamrock billed customers directly and paid franchisees monthly.  After a franchisee accepted and began servicing accounts, Shamrock would calculate the franchisee's total gross monthly revenue from the accounts, deduct all applicable monthly fees and installment payments owed to Shamrock, and issue the franchisee a statement and payment for the balance within thirty days. Shamrock advertised the centralized billing and collection service as its "cash flow protection" program.  (Exhibit 65, p. 46.)

On April 16, 2012, Spellacy sent a letter to Stratus executives stating:

> I am well aware of the grievances that have been filed against you.  Without getting into too much detail I believe that they have merit.  I can potentially overlook some of the sales practices that were employed in order to sell me a Master Franchise. What I can't overlook is the fundamental flaw in the system that overpays corporate for their contribution while underpaying the

---

[5] Franchisees were not prevented from soliciting their own business.  However, according to the FDD, Shamrock reserved the right to charge account acquisition fees if involved in the bidding and negotiation process, and any gross revenue generated by a franchisee was to be included for the purpose of calculating monthly royalty, administration, insurance, and other fees.  Although several of the named plaintiffs signed account acquisition agreements and paid account acquisition fees, the record is silent as to whether any franchisees solicited their own business.

Masters and ultimately the Unit Franchises. A system that relies on customer and unit franchise turnover in order to generate Franchise sales and account acceptance fees to keep the business open is inherently flawed. It is unsustainable. It's bad for customers and it's bad for the owner/operators. I did not get into this business to take advantage of other people in order to survive. We are fortunate that we have not been subject to this situation.

(Exhibit 22.)

[11] Shortly after, in June 2012, the Class filed a complaint against Stratus, Shamrock, Spellacy, Shamrock operations director Jerry Wenger ("Wenger"), and Shamrock employee Pamella Martins.[6] In the complaint, the Class members alleged that they failed to receive customer accounts generating the total income Shamrock had guaranteed in its advertisements and sales presentations, instead often realizing net income far below the hourly minimum wage.[7] The Class also alleged that Shamrock engaged in a practice called "churning," in which a franchisee's customer accounts are reassigned without cause to new or existing franchisees, thus generating more initial franchise and account acquisition fees, and enabling the master franchisor to cover its obligations to franchisees without acquiring new customer accounts. The

---

[6] The Class consists of two sub-classes: all franchisees who performed cleaning work, and those franchisees who purchased a franchise after April 16, 2012.

[7] For example, Class member Victor Garcia ("Garcia") paid $4160 cash for an SBS-9 plan ($9000/year or $750/month gross revenue) in October 2010. (Exhibit 46.) He accepted and cleaned an account, with $195 gross monthly revenue, in May 2011 and received a statement and check from Shamrock in June 2011. (Exhibit 47.) After deducting the royalty ($9.75), administration ($19.50), and insurance ($9.75) fees and the first of six installment payments for his supply starter kit ($145.83), Garcia netted $10.17.

complaint stated claims of franchise fraud and civil deception and alleged violations of the Indiana Deceptive Consumer Sales Statute (I.C. § 24-5-0.5), Indiana Wage Payment Statute (I.C. § 22-2-5), Indiana Wage Deductions Statute (I.C. § 22-2-6), and the Truth in Lending Act (15 U.S.C.A. § 1601 *et seq.*).

[12] Spellacy filed for Chapter 7 bankruptcy protection in December 2012, and Shamrock followed suit in July 2013. The Class eventually reached a settlement with Spellacy and Wenger, and default judgments were entered against Shamrock and Martins.

[13] A bench trial was held on June 1, 2, and 3, 2015 on the remaining claims that Stratus aided and abetted franchise fraud and committed civil deception. The Class sought a refund of over $800,000 in franchise fees paid, plus interest and attorney fees. On August 26, 2015, the trial court issued findings of fact and conclusions of law and entered judgment in favor of Stratus on both claims.

[14] The Class now appeals, challenging only the trial court's judgment with respect to aiding and abetting franchise fraud.

# Discussion and Decision

## Standard of Review

[15] When matters are tried before the court without a jury, Indiana Trial Rule 52 provides that a court, either *sua sponte* or upon a party's written request filed prior to the admission of evidence, "shall find the facts specially and state its

conclusions thereon." T.R. 52(A). Pursuant to Trial Rule 52, the Class filed a written request for special findings and conclusions. The purpose of making special findings is to provide the parties and reviewing court with the trial court's theory of the judgment. *Indianapolis Ind. AAMCO Dealers Advert. Pool v. Anderson*, 746 N.E.2d 383, 386 (Ind. Ct. App. 2001).

[16] Our standard of review for findings and conclusions is two-tiered: we first determine whether the evidence supports the court's findings, and then whether the findings support the judgment. *Id.* On appeal, we shall not set aside the findings unless clearly erroneous. *Id.* "Findings of fact are clearly erroneous when the record lacks any reasonable inferences from the evidence to support them." *Id.* Similarly, a judgment will only be reversed if it is clearly erroneous. *Id.* Because the Class is appealing from a negative judgment, "we will reverse only if the evidence is without conflict, and all reasonable inferences to be drawn from the evidence lead to a conclusion other than that reached by the trial court." *Id.* (citing *Lee's Ready Mix & Trucking, Inc. v. Creech*, 660 N.E.2d 1033, 1037 (Ind. Ct. App. 1996)). On appeal, we will not reweigh the evidence nor judge witness credibility. *Id.* Moreover, "where a trial court has made special findings pursuant to a party's request under Trial Rule 52(A), the reviewing court may affirm the judgment on any legal theory supported by the findings." *Mitchell v. Mitchell*, 695 N.E.2d 920, 923 (Ind. 1998).

# Franchise Fraud

[17] The Class's complaint alleged that Stratus aided and abetted Shamrock in the commission of franchise fraud. Indiana Code chapter 23-2-2.5 ("the Franchise Act" or "the Act") governs franchise sales in Indiana. Section 23-2-2.5-27 of the Act provides:

> It is unlawful for any person in connection with the offer, sale or purchase of any franchise, or in any filing made with the commissioner, directly or indirectly:
>
> (1) to employ any device, scheme or artifice to defraud;
>
> (2) to make any untrue statements of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of circumstances under which they are made, not misleading; or
>
> (3) to engage in any act which operates or would operate as a fraud or deceit upon any person.

[18] To establish a violation of section 27(2) by false statement or omission, "one must prove the alleged violator, in connection with the offer, sale, or purchase of a franchise or in a filing with the [Indiana Securities] Commissioner, made a false statement of material fact or omitted to state a material fact necessary in order to make statements made not misleading." *Enservco, Inc. v. Ind. Sec. Div.*, 623 N.E.2d 416, 422 (Ind. 1993). Information is material if there is a substantial likelihood that a reasonable investor would have viewed the information as having significantly altered the total mix of available

information.  *Id.* at 423 (citation and quotation marks omitted).  In sum, when the alleged fraud under Section 27(2) is based on false statements or omissions, the elements are "a false statement or omission, materiality, and harm caused by reliance on the statement or omission."  *Id.* at 425.  As to aiding and abetting, the Act provides:

> Every person who materially aids or abets in an act or transaction constituting a violation of this chapter is also liable jointly and severally to the same extent as the person whom he aided and abetted, unless the person who aided and abetted had no knowledge of or reasonable grounds to believe in the existence of the facts by reason of which the liability is alleged to exist.

I.C. § 23-2-2.5-29.

### *Federal Trade Commission Regulations*

[19]  Before reviewing the trial court's findings and conclusions, we first must address the Class's argument that the Act "incorporates by reference" Federal Trade Commission ("FTC") regulations governing franchises, particularly those concerning "financial performance representations" in a franchise disclosure statement.[8]  (Appellant's Br. 31.)

---

[8] Under the FTC Franchise Rule, 16 C.F.R. § 436, a franchisor must state in a disclosure document whether he or she is making a financial performance representation.  16 C.F.R. § 436.5(s).  Financial performance representation means "any representation, including any oral, written, or visual representation, to a prospective franchisee, including a representation in the general media, that states, expressly or by implication, a specific level or range of actual or potential sales, income, gross profits, or net profits.  The term includes a chart, table, or mathematical calculation that shows possible results based on a combination of variables."  16 C.F.R. § 436.1(e).  A franchisor is not prohibited from making a financial performance representation; however, if one is made, "the franchisor must have a reasonable basis and written

Generally, no person may offer or sell any franchise in Indiana without first providing to the prospective franchisee a disclosure statement and a copy of all proposed contracts relating to the franchise sale. I.C. § 23-2-2.5-9(2). The Act further provides that "[t]he disclosure statement shall be in a form prescribed by the [Indiana securities] commissioner or in a form permitted under 16 CFR 436, as amended." I.C. § 23-2-2.5-13. As to the form, the commissioner has ordered that "[a]ll disclosure statements . . . shall comply with the Uniform Franchise Offering Circular (UFOC) Guidelines established by the North American Securities Administrators Association (NASAA) and the [FTC] Franchise Rule . . . found at 16 C.F.R. § 436, as amended." *Order Regarding Franchise Registrations by Notification*, No. 01-0109 AO (June 4, 2001), *available at* https://secure.in.gov/sos/securities/2568.htm (last visited April 28, 2016).

The Class argues that because Section 23-2-2.5-13 refers to the FTC Franchise Rule, any deceptive act in violation of the FTC Franchise Rule necessarily constitutes franchise fraud under Indiana law. We disagree. In Section 23-2-2.5-13, our legislature vested the Indiana securities commissioner with the power to prescribe the form of the franchise disclosure statement, and the

---

substantiation for the representation at the time the representation is made and must state the representation in the Item 19 disclosure." 16 C.F.R. § 436.5(s)(3). Under federal law, it is an unfair or deceptive act or practice to fail to follow the instructions for preparing disclosure documents. *See* 16 C.F.R. § 436.6(a).

In the FDD, Stratus and Shamrock represented under Item 19 that they "do not make any representations about a franchisee's future financial performance . . . ." (FDD 30.) The Class argues that Stratus and Shamrock repeatedly made financial performance representations without the required disclosures whenever it promised franchisees a certain amount of total income or gross revenue in exchange for a franchise fee. In its findings and conclusions, the trial court cited the definition of financial performance representations and concluded that Stratus and Shamrock did not make them.

commissioner has ordered that the statement comply with the UFCO Guidelines. However, this requirement for the form of the franchise disclosure statement does not establish the FTC Franchise Rule as the standard by which a claim of franchise fraud is evaluated under Indiana law. *See Enservco*, 623 N.E.2d at 422 (in interpreting Indiana Code section 23-2-2.5-27, observing that "[w]e look to persuasive federal court authority interpreting parallel securities provisions only to the extent we cannot discern the meaning of our statute from its text and apparent purpose").

[22] Further, to the extent the Class seeks to recover damages arising from alleged violations of the disclosure requirements in Section 23-2-2.5-13, our supreme court has long held that the Franchise Act does not provide a private right of action for violations of its disclosure provisions. *Continental Basketball Ass'n, Inc. v. Ellenstein Enters., Inc.* 669 N.E.2d 134, 137 (Ind. 1996). While the statute confers broad enforcement authority for its provisions on the Indiana securities commissioner and the prosecutor, the enforcement authority of private parties is limited to combating violations of the anti-fraud provision. *Id.* Thus, "[a] private right of action 'arises for failure to comply with the [Act] only upon allegations of facts which would support an inference of fraud, deceit, or misrepresentation.'" *Id.* (quoting *Moll v. South Cen. Solar Sys., Inc.*, 419 N.E.2d 154, 162 (Ind. Ct. App. 1981), *disapproved in part on other grounds*, *Enservco*, 623 N.E.2d at 425).

[23] Accordingly, we turn our attention back to the court's findings and conclusions with respect to aiding and abetting franchise fraud under Indiana Code section 23-2-2.5-27.

### Findings of Fact

[24] On appeal, the Class first contends that nine of the trial court's factual findings were unsupported by the evidence presented at trial. The Class points to the trial court's citations to documents not admitted into evidence – such as Exhibit 34 and Wenger's deposition testimony – reasoning that the "court was apparently misled into including these findings" by Stratus's proposed findings and conclusions. (Appellant's Br. 37.)

[25] Trial Rule 52(C) encourages trial courts to request that parties submit proposed findings of fact and conclusions of law, and it is not uncommon or *per se* improper for a trial court to enter findings that are reproductions of the prevailing party's submissions. *In re Marriage of Nickels*, 834 N.E.2d 1091, 1095 (Ind. Ct. App. 2005). When preparing proposed findings, a party should take great care to insure the findings are sufficient to form a proper factual basis for the ultimate conclusions of the trial court. *Id.* Moreover, the trial court should remember that when it signs one party's findings, the court is ultimately responsible for their correctness. *Id.* at 1096. Therefore, we urge trial courts to scrutinize parties' submissions for mischaracterized testimony and legal argument rather than the findings of fact and conclusions of law contemplated by the rule. *Id.* While we by no means encourage the wholesale adoption of a party's proposed findings and conclusions, the practice of adopting a party's

proposed findings is not prohibited. *Id.* The critical inquiry is whether such findings, as adopted by the court, are clearly erroneous. *Id.*

[26] The Class first challenges the court's findings concerning the income representations Shamrock made to prospective franchisees. As the trial court found:

> 36. In the documents provided by Stratus to Shamrock were various "Franchise Plans," which described potential options for Unit Franchisees. The chart categorized a plan by "Total Income" and various amounts which could be used to finance that plan. [. . . .]

(App. 221.) This finding is supported by Exhibit 104, the franchise chart Shamrock used during sales presentations and that also appears in the Stratus franchise sales manual. The trial court also found that Stratus advised Shamrock to explain the "Total Income" column as "gross revenue":

> 70. . . . Additionally, the scripts provided by Stratus repeatedly informed Shamrock to describe the money under "Total Income" as "gross revenue" and to never make future financial guarantees. (Exhibit A ¶ 265, Record at 169-70, 273, 278, 363.)
>
> 77. . . . Stratus advised Shamrock to not make statements regarding future income potential . . . .

(App. 228-29.) The franchise sales manual (admitted as Exhibit 65, not Exhibit A) instructs master franchisors to explain the "Total Income" column by saying: "With this plan, you are guaranteed gross revenue of $3,000 a month or $36,000 a year." (Exhibit 65, p. 53.) The manual also advises master

franchisors that they "cannot tell a Candidate how much money they will make. Every Franchisee will run their business differently, therefore, each will have a different profit margin." (Exhibit 65, p. 63.) Thus, there is support in the record for the court's findings concerning Stratus's advice to Shamrock about income representations.

[27] The Class also challenges the trial court's findings concerning the written terms and conditions of documents given to franchisees. At trial, the Class attempted to introduce into evidence Exhibit 34, a collection of documents that apparently included incomplete UFAs (consisting only of four or five signed pages)[9] and receipts for training materials. However, Stratus objected to their admission due to their incompleteness, and Exhibit 34 was not admitted into evidence. Nevertheless, the trial court made the following specific findings as to the UFAs and the training materials, citing Exhibits 34, A, and G:[10]

> 38. Shamrock utilized incomplete Unit Franchise Agreement templates, provided by Stratus, to create and execute Unit Franchise Agreements which [sic] each member of the individual class. (Exhibit A ¶ 52, Exhibit G, 82.)

> 41. The signature page read in relevant part, "I, the undersigned, do acknowledge that I received on the date written the following

---

[9] Wegner testified that at Stratus's direction, Shamrock used only four or five pages of the UFA at closing.

[10] Exhibit A is a record of payments made by Shamrock to franchisee Jaime Alonso between August 2010 and October 2012. Exhibit G contains select pages of unit franchisee Lorenzo Rodriguez's deposition testimony.

Stratus Building Solutions training manuals." (Record at 82; Exhibit 34).

43. Section thirteen (13) of the Unit Franchise Agreement is titled "Business Risk" and provides, in part:

Franchisee, as an independent business person, recognizes that there are economic hazards in connection with the operation of any business, including the type contemplated pursuant to this Agreement. Success, whether financial or otherwise, is not guaranteed by Franchisor . . . Franchisee acknowledges that it has not received from the Franchisor or Stratus, **and is not relying upon, any representations or guarantees**, express or implied, as to the potential volume, sales, income or profits of a Franchised Business.

(**emphasis applied**) Exhibit G, 95-96.

46. The income levels listed on the financial performance representations, state that the income levels are "measured in gross annual billing."

70. . . . the chart was contextualized in the contract; it was explained that the income levels were measured in gross annual billing. . . . .

73. . . . it is clear from the plain language of the instrument that "Total Income" was understood as "Gross Revenue."

76. . . . the signature pages indicated that the Unit Franchisees received the training materials which contained further information concerning the fees and expenses associated with the business. [. . . .]

83. . . . the contract defined the figures of the estimated value of the accounts as "gross," or the value before expenses and deductions are taken out of something.

(App. 221-23, 227-29, 232.)

[28] Shamrock's 2008 franchise registration included an FDD and template UFA provided by Stratus. Both Spellacy and Wenger testified that, at Stratus's instruction, Shamrock provided prospective franchisees with copies of the FDD, UFA, and training materials after the franchisees attended a sales presentation. Spellacy also testified that prospective franchisees had to sign and date a receipt acknowledging they received the documents.

[29] The FDD contained a franchise chart that used the heading "Customer Accounts (measured in gross annual billing)," rather than "Total Income." (FDD 8).[11] The UFA described the master franchisor's obligation as to provide franchisees customer accounts with the agreed level of "projected gross revenue per year . . . ." (FDD 36.) The UFA also included the "business risk" provision quoted in finding forty-three. (FDD 49.) One Class member, Victor Garcia, acknowledged signing a receipt for training materials that contained the language quoted in finding forty-one. Therefore, the record supports the court's

---

[11] In citations, "FDD" refers to the FDD that begins on page forty of Exhibit 8. Page numbers correspond to the FDD's internal pagination.

findings concerning the written terms of the documents Stratus instructed Shamrock to present to prospective franchisees.

[30] The Class also challenges the court's finding about Shamrock's ability to meet its contract obligations. The trial court found:

> 47. Many, though not all, Class members have reached the income projection for their corresponding amount of investment. (Record at 316; Wenger Dep. 134:16-22, 135: 1-2). [. . . .]

(App. 223.) As noted above, Wenger's deposition testimony was not admitted into evidence. However, Spellacy testified at trial that, until Shamrock declared bankruptcy, Shamrock was able to provide franchisees the level of business for which the franchisees contracted. Spellacy testified that "we had never not fulfilled a Franchise Agreement until the lawsuit happened[.]" (Tr. 258.) He further testified that "we always had the accounts" and "[w]e made every agreement." (Tr. 235.) On the other hand, all testifying Class members explained that they did not receive adequate customer accounts to achieve the "total income" they were guaranteed. To the extent the trial court credited Spellacy's testimony over that of the Class, we will not reweigh the evidence or judge witness credibility on appeal. *Anderson*, 746 N.E.2d at 386.

[31] In sum, the trial court's findings are supported by the evidence.

### *Conclusions Thereon*

[32] At trial, the Class argued that Stratus aided and abetted fraud by providing Shamrock with sales materials advertising "guaranteed customers" and

promising certain income levels in exchange for a franchise fee. The Class members testified that they relied on these representations, which were material to their decisions to purchase the franchises, but that these statements and guarantees were false or misleading.

[33] The trial court concluded, however, that Shamrock did not engage in franchise fraud and, absent any fraud on Shamrock's part, entered judgment in favor of Stratus on the aiding and abetting claim. The court's order reveals three rationales for the court's conclusion: (1) the FDD, UFA, and sales presentation "contextualized" (App. 227) any misleading statements or omissions made in the franchise chart and advertisements; (2) there was insufficient evidence that Stratus and Shamrock failed to act in good faith;[12] and (3) the Class was not justified in relying on Shamrock's statements where the UFA contained a provision disclaiming reliance on any express or implied representations or guarantees.

[34] As to the court's first articulated theory – that Shamrock did not make material false statements concerning income guarantees – we cannot say that the court's conclusion was clearly erroneous. Although the franchise chart uses the term

---

[12] As the Class contends and Stratus concedes, the trial court made an error of law in finding that "Plaintiffs have the burden of demonstrating that the violations . . . were not made in good faith or honest dealing." (App. 229.) Section 27(2) and (3) do not include a scienter requirement when an alleged violation involves false statements or omissions, and in this way "operate as strict liability provisions[.]" *Enservco*, 623 N.E.2d at 423. Only when an alleged fraud under Sections 27(2) and 27(3) is committed by future promise or representation or prediction did the legislature explicitly incorporate the mental state of "not made honestly or in good faith." *Id.* at 423 n.11.

"Total Income," the franchise sales manual, FDD, and UFA refer to "gross revenue" (Exhibit 65, p. 53), "gross annual billing" (FDD 8), or "projected gross revenue per year" (FDD 36), respectively. The FDD also discloses the Stratus fee structure, including royalty, administration, insurance, and account acquisition fees deducted from gross revenue.

[35] The Class argues, however, that Shamrock made material omissions when it failed to tell franchisees that Shamrock believed that its obligation to franchisees was not to *guarantee* accounts, but to *offer* the franchisee customer accounts to service within a certain time frame. According to the UFA, the master franchisor had 120 days to offer customer accounts to franchisees (plus additional time if the franchisee purchased a plan offering over $36,000 in gross revenue). The UFA also provided that "[i]n the event that Franchisee rejects any customer accounts which are provided as part of this Franchise Plan or subsequently discontinues servicing such accounts, then Franchisor shall be deemed to have fulfilled its obligations hereunder." (FDD 36-37.) The UFA thus disclosed the time frame under which Shamrock was required to offer accounts and placed the burden on franchisees to accept offered accounts.

[36] The Class also argues that Shamrock made material omissions when it failed to inform Class members purchasing accounts after April 16, 2012 that Spellacy believed the Stratus system was "inherently flawed" and "unsustainable" because it "relie[d] on customer and unit franchise turnover in order to generate Franchise sales and account acceptance fees to keep the business open . . . ." (Exhibit 22.) However, the trial court apparently accepted Spellacy's trial

testimony that the statements in his April 16, 2012 letter to Stratus executives were made in an attempt "to negotiate a lower royalty fee" (Tr. 238) and that in practice he did not have to engage in unscrupulous tactics to keep the business afloat.

[37] Moreover, the evidence is clear that Stratus provided Shamrock with the FDD and UFA and instructed Shamrock to provide them to prospective franchisees. Thus, even if Shamrock ignored Stratus's instruction, the court's finding that these documents, prepared by Stratus, disclosed the scheme in sufficient detail to allow prospective franchisees the opportunity to exercise independent judgment before purchasing a franchise supports the court's conclusion that Stratus did not aid and abet Shamrock in making material false representations or omissions.

[38] As our supreme court has recently observed, "sometimes standards of review decide cases." *Robinson v. State*, 5 N.E.3d 362, 363 (Ind. 2014). The Class carries a heavy burden on appeal from a negative judgment. In this case, the Class has not shown that the evidence is without conflict and that all reasonable inferences lead to a conclusion other than that reached by the trial court.

# Conclusion

The trial court's finding that Stratus did not aid and abet Shamrock in the commission of franchise fraud was not clearly erroneous.

Affirmed.

Vaidik, C.J., and Crone, J., concur.