


FILED

Jun 24 2024, 9:35 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

I N   T H E

# Court of Appeals of Indiana

Mark D. Stanley,

*Appellant-Respondent*

and

Karlynne D. Akos, Jeffrey H. Stanley, Kevin A. Stanley and Hire
Holdings, LLC,

*Appellants/Intervenors*

v.

Lisa Stanley,

*Appellee-Petitioner*

---

June 24, 2024

Court of Appeals Case No.
23A-DN-2810

Appeal from the Kosciusko Superior Court

The Honorable Christopher D. Kehler, Judge

Trial Court Cause No.
43D04-2009-DN-242

**Bailey, Judge.**

# Case Summary

[1] Lisa Stanley filed a petition for dissolution of her marriage to Mark Stanley and requested a division of the marital property pursuant to Indiana Code Section 31-15-7-4.[1] Mark's siblings – Karlynne Akos, Jeffrey Stanley, and Kevin Stanley – and Hire Holdings, LLC (an Ohio corporation created by Mark and his siblings) (collectively, "Intervenors") intervened in the dissolution proceedings to assert an interest in lake front property deeded to Mark in settlement of the estate of Karol Stanley ("Lake House"). Intervenors sought to establish that Mark holds four-fifths of the Lake House in trust for his siblings, and they requested findings and conclusions pursuant to Indiana Trial Rule 52(A). The trial court concluded that the entirety of the Lake House is marital property and entered a final judgment upon that interlocutory order. Mark and Intervenors (collectively, "the Stanleys") appeal, raising the issue of whether the judgment is clearly erroneous because estate and rental agreement documents

---

[1] [1] Indiana Code Section 31-15-7-4 requires the trial court to divide all property of the parties, including property acquired by either spouse in his or her own right after the marriage and before final separation of the parties.

collectively evince an express trust or because uncontroverted testimony of intent supports recognition of a resulting trust. We reverse and remand for further proceedings.

# Facts and Procedural History

Lisa and Mark married on May 26, 2006, and in 2011, they moved into the Lake House with Mark's parents, Karol and Sasha Stanley. The Lake House had been acquired by a Stanley ancestor in the early 1900's and was then owned jointly by Mark's parents. Sasha died in 2011 and Karol died in 2015.

Karol's will left two parcels of real estate in equal shares to his five children: the Lake House (appraised at over $900,000) and a house in Ohio, which was in a state of disrepair (the "Banyon House"). Jeffrey and Mark served as co-representatives of the estate. They and their siblings agreed that they needed to mortgage the Lake House and renovate the Banyon House for use as a rental property. Mark was the only one of the siblings without a mortgage and he agreed to obtain a mortgage using the Lake House as collateral.

After consultation with the estate's attorney, Laura Kaufman, the co-representatives executed a deed transferring the Lake House to Mark and the remaining siblings executed consents to distribution. Mark obtained a $125,000 mortgage; he used some of the funds to pay off Karol's debt and some to renovate the Banyon House. The siblings also contributed some of their personal funds for renovation projects at both properties. In 2017, Jeffrey

prepared and signed a rental agreement naming Mark and Lisa as tenants of the Lake House.

[5] In February of 2020, one of the Stanley siblings passed away, leaving a will that divided her interest in the Banyon House between her four remaining siblings and naming Karlynne as her residuary estate beneficiary. On August 26, 2020, the surviving siblings incorporated Hire Holdings and thereafter they registered Hire Holdings as a foreign corporation in the State of Indiana. On September 10, 2020, Lisa filed her petition for divorce; she also obtained a temporary restraining order prohibiting transfer of marital assets. Mark subsequently transferred the Lake House by quit claim deed to Hire Holdings. The siblings individually, and on behalf of Hire Holdings, successfully moved to intervene in the dissolution action.

[6] On April 24, 2023, Intervenors filed a pre-hearing memorandum. They asserted the position that "distribution of the Real Estate to Mark was impressed with a trust for the benefit of himself and his four other siblings and, accordingly, that 4/5 of the Real Estate should be withheld and/or excluded from being considered marital property in this matter." App. Vol. II, pgs. 45-46. The memorandum described requirements for either an express trust or a resulting trust.

[7] The trial court conducted hearings on May 8 and May 25, 2023. Mark, Jeffrey, and Karlynne testified that they, together with their other siblings, had intended that Mark hold the Lake House for the benefit of all the siblings. The

Intervenors submitted into evidence the 2017 lease, denominated a Real Estate Agreement, designating the "Stanley Family" as landlord and Mark and Lisa as tenants. The agreement provided, among other things, that Mark would pay the mortgage payments in lieu of rent payments, he would perform minor maintenance tasks, the family would be responsible for larger repairs, and the agreement would terminate in ten years.

[8] According to the testimony of his siblings, Mark had been appointed to obtain a mortgage because he was in the best financial position to do so; mortgage proceeds were to be used for family debts and renovations; and eventually, the Lake House would be transferred into either a holding company or family trust. The sibling testimony was in part corroborated by attorney Kaufman. She testified that, notwithstanding the execution of consents to distribution, there had been "no buyout of siblings" and no "swap of estate assets." (Tr. Vol. II, pg. 59.) Rather, Mark had been deeded the Lake House "with no strings attached" but in the context of family anticipation that there would be a rental arrangement and a transfer of the Lake House in the future when the siblings decided upon whether a holding company or family trust was the best course of action. (*Id.* at 61.) Kaufman clarified that she had advised the estate heirs that the conveyance to Mark was not equivalent to creation of a trust. Her understanding was that Mark would hold the Lake House as an "intermediary." (*Id.* at 48.)

[9] On August 22, 2023, the trial court issued its findings of fact, conclusions thereon, and order. The trial court concluded that Intervenors had not met the

burden of showing an express trust was created and declined to recognize a resulting trust because "precluding Lisa from having an interest in the Lake House would be neither equitable or just." Appealed Order at 15. The trial court thus determined that the Property is a marital asset, in which Intervenors have no interest. On October 31, the trial court directed the entry of the order as a final judgment. This appeal ensued.

## Discussion and Decision

[10] Intervenors requested special findings of fact and conclusions of law pursuant to Indiana Trial Rule 52(A). In these circumstances, our standard of review is well-settled:

> we determine whether the evidence supports the trial court's findings, and whether the findings support the judgment. *Indianapolis Ind. Aamco Dealers Adver. Pool v. Anderson*, 746 N.E.2d 383, 386 (Ind. Ct. App. 2001). We will not disturb the trial court's findings or judgment unless they are clearly erroneous. *Id*. Findings of fact are clearly erroneous when the record lacks any reasonable inference from the evidence to support them. *Culley v. McFadden Lake Corp.*, 674 N.E.2d 208, 211 (Ind. Ct. App. 1996). A judgment is clearly erroneous when a review of the record leaves us with a firm conviction that a mistake has been made. *Carroll v. J.J.B. Hilliard, W.L. Lyons, Inc.*, 738 N.E.2d 1069, 1075 (Ind. Ct. App. 2000), *trans. denied* 761 N.E.2d 411 (Ind. 2001). We will neither reweigh evidence nor judge the credibility of witnesses, but will consider only the evidence favorable to the judgment and all reasonable inferences to be drawn therefrom. *Anderson*, 746 N.E.2d at 386; *Gunderson v. Rondinelli*, 677 N.E.2d 601, 603 (Ind. Ct. App. 1997).

*Weiss v. Harper*, 803 N.E.2d 201, 205 (Ind. Ct. App. 2003).

[11] As a preliminary matter, the parties point to claimed deficiencies in the factual findings and dispute whether the findings that were entered are adequate to permit meaningful appellate review.

> "Special findings are those which contain all facts necessary for recovery by a party in whose favor conclusions of law are found." *Bowman v. Bowman*, 686 N.E.2d 921, 925 (Ind. Ct. App. 1997). The findings are adequate if they are sufficient to support a valid legal basis for the trial court's decision. *Id.* The purpose of special findings of fact is to provide reviewing courts with the theory on which the judge decided the case, so they should contain a statement of the ultimate facts from which the trial court determined the legal rights of the parties. *Id.* "On appeal, we construe the trial court's findings together liberally in support of the judgment; however, we may not add anything to the special findings of fact by way of presumption, inference, or intendment." *Baltimore & Ohio R.R. Co. v. Taylor*, 589 N.E.2d 267, 271 (Ind. Ct. App. 1992), *trans. denied* 600 N.E.2d 543 (Ind. 1992) (citation omitted).

*Weiss*, 803 N.E.2d at 205.

[12] The Stanleys argue that the trial court order is deficient in that it omits any reference to the intent of the siblings when they executed the deed to Mark. They contend that their intent was to create an express trust and they did so, as evidenced by the estate documents, a rental agreement, and their conduct. Lisa, in turn, argues that any deficiencies in the findings do not render the decision clearly erroneous because the evidence of record supports the trial court's ultimate conclusions. However, she contends that the trial court failed

to adequately address evidence of unclean hands, that is, Mark's representations to mortgage lenders that the Lake House was his property. These claimed omissions do not preclude our review. We are able to discern the theory upon which the trial court's decision rests; that is, the trial court was not persuaded that the Stanleys had established either an express or resulting trust. In reaching its decision, the court acknowledged admission of the rental agreement into evidence but did not rely upon the language of the document. The trial court stated that it had "inferred" from Mark's refusal to answer questions related to fraud and the surrounding circumstances that his applications for mortgages "could" have been fraudulent if the Lake House was held in trust. (Appealed Order at 8.) Finding the order adequate for appellate review, we turn to the merits.

[13] Pursuant to Indiana Code Section 30-4-1-1(a): "A trust is a fiduciary relationship between a person who, as trustee, holds title to property and another person for whom, as beneficiary, the title is held." A trust may be an express trust set forth in writing, or an implied trust, which is a "creature of equity, imposed to do justice." *Presbytery of Ohio Valley v. OPC*, 973 N.E.2d 1099, 1108 (Ind. 2012). In Indiana, implied trusts arise in two forms: constructive trusts and resulting trusts. *Id.* at 1109.[2]

---

[2]Constructive trusts are generally imposed when legal title to property is obtained through wrongful means, such as fraud, duress, undue influence, or theft. *Presbytery of Ohio Valley*, 973 N.E.2d at 1109. Here, we need not consider whether a constructive trust was created because there has been no claim made that Mark gained title to the Property through wrongful means.

[14] An express trust must be evidenced by a writing signed by the owner of the property, that is, the settlor. *Id.* at 1108 (citing Ind. Code § 30-4-2-1(a)). Certain terms, ascertainable with reasonable certainty from the writings, are essential to the creation of a trust, including: "(1) the trust property; (2) the settlor; (3) the identity of the trustee; (4) the identity of the beneficiary; and (5) the purpose of the trust." *Id.* at 1109. The terms may be set forth in multiple writings, provided that they are sufficiently "referred to and connected with" the signed writing so that they may be read as a single transaction. *Id.* The burden of proof rests on the party seeking to impress a trust upon real property when another holds legal title. *Id.* at 1108. There must be a "clear and unequivocal demonstration of the settlor's intent to create a trust" and such "heightened proof" is necessary to protect the sanctity of property ownership against trust claims not intended by the settlor. *Id.* at 1109.

[15] The Stanleys argue that they created an express trust with the aggregation of estate and lease documents. The documents prepared in the closing of Karol's estate – the co-representatives' deed, the closing statement, and the siblings' consents to distribute – facially disclose conveyance of the Lake House to Mark. The consents acknowledge an unequal distribution, without consideration, and none of the documents include a specific reference to a trust or purpose for a trust.

[16] In addition to the estate documents, the Stanleys submitted into evidence a Real Estate Agreement, which purportedly imposes upon Mark certain obligations as a tenant rather than sole owner of the Lake House. Lisa was identified as a co-

tenant. The trial court made certain factual findings to support its rejection of the Real Estate Agreement as a trust document. That is, the trial court found that Lisa had not signed the agreement; it was unclear in what capacity Jeffrey had signed the lease; and there was no specification of who was included in the Stanley Family and was therefore a landlord. Finally, the trial court questioned the timing of Mark's signature on the evidentiary exhibit because the copy submitted with the Motion to Intervene did not display Mark's signature.

[17] In sum, the trial court considered the Real Estate Agreement and concluded that the document, individually or in conjunction with the estate documents, does not constitute an express trust. Although the documents may arguably be connected, they do not evince a clear and unequivocal intent of the beneficiaries of Karol's estate to act as settlors creating a trust. The documents as a whole do not expressly set forth the identity of a settlor or settlors, trust purpose, identity of the trust, or the identity of each claimed beneficiary. The trial court did not clearly err in determining that the Stanleys had not met their burden to show that an express trust was created.

[18] The trial court also considered whether a resulting trust was created. A resulting trust is generally imposed in one of three circumstances: "(1) Where an express trust fails in whole or in part; (2) where an express trust is fully performed without exhausting the trust estate; (3) where property is purchased and the purchase price is paid by one person and at his direction the vendor conveys the property to another person." *Id.* at 1109. A resulting trust arising under the first of these circumstances, implicated here, "is created by operation

of law to give effect to the parties' intentions when they have otherwise failed to satisfy the statutory requirements for creating an express trust." *Id.* The settlor's intent "is crucial to the resulting trust analysis." *Id.*

[19] Lisa argues that, as a matter of law, the siblings' intentions are irrelevant to whether a resulting trust exists because such a trust is a creature of equity and Mark had unclean hands.

> The "unclean hands" doctrine demands that one who seeks relief in a court of equity must be free of wrongdoing in the matter before the court. *Galloway v. Hadley*, 881 N.E.2d 667, 678 (Ind. Ct. App. 2008). The alleged wrongdoing must have an immediate and necessary relation to the matter being litigated. *Id*. For the doctrine of unclean hands to apply, the misconduct must be intentional. *Id*. The purpose of the unclean hands doctrine is to prevent a party from reaping benefits from his misconduct. *Id*. The doctrine is not favored by the courts and is applied with reluctance and scrutiny. *Id*.

*Hardy v. Hardy*, 910 N.E.2d 851, 856 (Ind. Ct. App. 2009). At the hearing, Mark refused to answer certain questions propounded to him, and Lisa did not testify. However, other testimony from family members and family friends suggests that Mark and Lisa were not at odds regarding the acquisition and encumbrance of the Lake House during their marriage. Lisa did not request that the trial court make a finding that Mark had unclean hands or that the alleged wrongdoing had an immediate and necessary relation to the matter being litigated, the inclusion of an asset within the marital estate. We thus turn

to consider the evidence of an intention on the part of the siblings to create a trust rather than convey property to Mark as his sole property.

[20] Jeffrey testified that his parents intended that the Lake House, which had been in the Stanley family for generations, would "stay in the family." (Tr. Vol. II, pg. 10.) He described a situation where, upon Karol's death, the five siblings had jointly inherited one property needing substantial renovation and one property having substantial equity. Jeffrey testified that they decided the best course of action would be to mortgage the Lake House, use the proceeds to pay Karol's debt and renovate the Banyon House for rental, and ultimately use the rental proceeds to maintain the Lake House. According to Jeffrey, Mark was in the best position to obtain a mortgage and that was the reason for deeding the Lake House to Mark individually. Jeffrey testified that the siblings contributed personal funds for the benefit of both properties.

[21] Kaufman testified that she had been the attorney for Karol's estate and had participated in telephone conversations with Jeffrey as a co-representative of the estate. Kaufman testified that the siblings wanted their inherited property to be held "in trust" but were "not ready" to decide whether a family trust or creation of an LLC was best; her notes reflected that the decision was to be made "down the road." (*Id.* at 47, 49.) According to Kaufman, there had been no exchange of assets, buyout of siblings, or transfer of funds to effect an equal distribution. The Lake House was deeded to Mark with "no strings attached" but with an expectation that future action vis-à-vis the Lake House would be taken. (*Id.* at 61.)

[22] Karlynne Akos testified to her understanding that Mark had been holding the Lake House "in trust" and effectively paying rent by making the mortgage payments. (*Id.* at 171.) She denied that she had intended that Mark be the sole owner of the Lake House and she clarified that Mark did not exclusively possess the property. According to Karlynne, the siblings had individual rooms at the Lake House and the extended family members used a Shared Key app to schedule vacation time at the lake. Karlynne had installed a lock on her room door. Karlynne further testified that she had used proceeds from the estate of her deceased sister to make improvements to the Lake House.

[23] Mark testified that he agreed with his siblings that he should obtain a mortgage on the Lake House because he was in the best position to do so. From the $125,000 mortgage that Mark had obtained, he had paid Karol's debts and provided funding for repairs to the Banyon House. Mark's understanding was that he would "hold [the Lake House] in trust until transfer at a later time." (*Id.* at 234.) He testified that the siblings "kind of put a plan together" at their annual Fourth of July gathering in 2017. (*Id.* at 237.)

[24] In sum, it is clear that the siblings intended to convey the Lake House to Mark as a trustee for all the siblings, although the documents they executed did not expressly say as much. The trial court made no finding that the uncontroverted testimony lacked credibility. Rather, in this regard the trial court included in its order the following language denominated as a conclusion of law: "The Court believes that imposing a resulting trust, thereby precluding Lisa from having an interest in the Lake House, would be neither equitable or just." (Appealed

Order at 15.) But the Intervenors did not seek the exclusion of the Lake House in its entirety from the marital estate. Their asserted position was that one-fifth is includable **in the marital pot**.[3] The trial court's order did not accurately reflect the petition before it. Focusing upon timing rather than the uncontroverted evidence of intent, the factual findings do not support the conclusion that a resulting trust failed to arise by operation of law.

## Conclusion

[25] The factual findings support the conclusion that an express trust was not created. The findings do not support the conclusion that a resulting trust was not impressed upon the Property. The judgment is clearly erroneous in this regard.

[26] Reversed and remanded.

Altice, C.J., and Mathias, J., concur.

ATTORNEYS FOR APPELLANT MARK D. STANLEY

Andrew E. Grossnickle
Beers Mallers Backs & Salin LLP
Warsaw, Indiana

---

[3] **We do not suggest that the Stanleys' position is that Lisa should ultimately be awarded a portion of that one-fifth share of the Lake House. "Indiana's 'one pot' theory prohibits the exclusion of any asset in which a party has a vested interest from the scope of the trial court's power to divide and award."** *Wanner v. Hutchcroft*, **888 N.E.2d 260, 263 (Ind. Ct. App. 2008). However, although all property owned by the parties is includable, Indiana Code Section 31-15-7-5(2)(B) permits the trial court to consider "the extent to which the property was acquired by each spouse through inheritance or gift."**

ATTORNEYS FOR APPELLANTS/INTERVENORS KARLYNNE D. AKOS, JEFFREY H. STANLEY, KEVIN A. STANLEY, AND HIRE HOLDINGS, LLC

Randy J. Spitaels
Kindig & Sloat, PC
Nappanee, Indiana

Curtis E. Shirley
Law Office of Curtis E. Shirley, LLC
Carmel, Indiana

Andrew E. Grossnickle
Beers Mallers Backs & Salin, LLP
Warsaw, IN

ATTORNEY FOR APPELLEE LISA STANLEY

Jay A. Rigdon
Scott E. Reust
Rockhill Pinnick LLP
Warsaw, Indiana